# Supreme Court of Texas

### No. 22-1143

Henry S. Miller Commercial Company,

*Petitioner–Cross-Respondent,*

v.

Newsom, Terry, & Newsom, LLP and Steven K. Terry,

*Respondents–Cross-Petitioners*

### On Petition for Review from the
### Court of Appeals for the Fifth District of Texas

JUSTICE YOUNG, joined by Justice Bland, concurring.

*Scene*: Two lawyers, beverages in hand, sitting in a dive bar after a jury trial in which Lawyer 1's client prevailed over Lawyer 2's:

LAWYER 1:    Remember how I said at trial that my client should totally win because all the facts and all the law were on our side? Yeah—that was a lie. We didn't have a leg to stand on! There is *no way* we could have won—unless the lawyer for the other side <*cough, cough*> really botched it.

LAWYER 2:    *You* told a lie? Hold my beer. I kept saying that my client should win and was on the side of Truth, Goodness, and Justice—but that was a lie. We lost and we *should* have lost. It would have been *crazy* for a jury to rule for my side.

Such a conversation would be dispiriting enough if held in private. But—my liberties with the script notwithstanding—this case involves essentially that same conversation being played out in a courtroom, after Lawyer 1 and his client teamed up with Lawyer 2's client to sue Lawyer 2 for legal malpractice.

I write separately to further address one aspect of the case with which the Court's scholarly and well-reasoned opinion grapples: how the judicial system should respond to cases, like this one, in which a legal-malpractice claim is not impermissibly "assigned" (and so cannot be barred), yet still implicates the concerns that led this Court to preclude such assignments in the first place.

Specifically, the Court focuses on the troubling distortion of positions reflected in my exaggerated exchange between Lawyer 1 and Lawyer 2 above. At the underlying trial, Nussbaum and his counsel argued that Nussbaum should win because the claim against his opponent HSM, and HSM alone, was airtight. Nussbaum won. His side now argues (in essence) that the win is explained not by the strength of the claim, but only by the ineptitude of HSM's lawyer. Such position-switching when convenient—which is to say, when lucrative—is more than troubling. It harms our system of justice and, as the Court notes, fosters cynicism about the legal profession and about the integrity of the judgments that result from litigation.

The Court describes one important mitigating tool that a trial court must deploy in this situation: ensuring "that a jury is fully aware of" the positional distortion in the malpractice litigation so that the jury will "not be confused or misled by [the] change of position and financial interest in

2

the outcome." *Ante* at 3. "Full disclosure of the parties' positions and interests in a legal malpractice case . . . is the trial court's remaining tool to remedy [the] harm" that flows from "a pernicious distortion of positions in a legal malpractice case." *Id.* at 20. As diluted as mere disclosure may seem, it at least helps address "the real risk of confusion to jurors hearing parties taking positions seemingly contrary to their apparent pre-litigation interests." *Id.* at 16.

Transparency has at least some of the disinfecting power of sunlight. It grants the jury a pinch or more of salt for when it hears new positions expressed with all the certainty and apparent sincerity with which the exact opposite positions were previously expressed. Not all malpractice cases involve these distortions, but when they do, it means that a jury is asked to reach the result opposite of the one reached by the jury in the underlying trial—and the second jury is being asked to do so by a side repudiating its own prior *win*. In such a case, transparency allows the jury the dignity of approaching its task fully informed.

But is transparency quite enough to address the position-switching problem? Barring such a claim would go too far, the Court holds, if the party who owns it does not formally or practically "assign" it. I somewhat reluctantly agree. But is there any intermediate step available to the judiciary, or perhaps to the legislature, that might go beyond mere transparency while stopping short of preclusion? One possibility might lie in reconsidering the standard of proof for malpractice cases—not all of them, but those involving the position-switching the Court describes. If such cases required a jury to find malpractice not by a preponderance of the evidence but by clear and convincing evidence, it might at least help

3

assure the public that if a jury finds malpractice, the malpractice was genuine and harmful and not just a *post hoc* spin by lawyers. A heightened standard of proof might therefore advance the goal of preventing the demeaning of the legal profession. It would make it harder for one to "abrupt[ly] and shameless[ly]" switch positions—moving from arguing that he won because he had the stronger case to arguing that he won only because his opponent's lawyer was negligent. *Zuniga v. Groce, Locke & Hebdon*, 878 S.W.2d 313, 318 (Tex. App.—San Antonio 1994, writ ref'd).

The currently prevailing standard of proof, by contrast, allows parties and lawyers to adduce summary opinion evidence from distorted positions to predict what a jury would have decided had a case been tried differently. The Court rightly concludes that the opinion evidence in this case—that Lawyer 2's negligence was the sole cause of the fraud judgment—was conclusory and thus cannot support the verdict even under the preponderance standard. But the question remains whether the standard should be higher—perhaps leading not to a remand but to a rendition in this case, and perhaps ensuring that in other cases only truly meritorious claims proceed.

The parties have not argued this significant issue, and the Court rightly does not address it. Nor do I prematurely endorse elevating the standard of proof—if the issue is put to us directly, perhaps I will be persuaded by the parties and interested amici that the idea is mistaken. The preponderance standard has its virtues too, after all, including giving genuinely wronged parties the necessary leeway to vindicate their interests against bad lawyering.

4

For today, therefore, my goal is modest: to note that it may be worthwhile to examine the standard of proof in a future case, especially if petitioner's warnings about the consequences of not barring this case from proceeding prove prescient.

                                            _____

                                            Evan A. Young
                                            Justice

**OPINION FILED:** December 31, 2024